IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GARY L. COLLINS,              )
                             )
          Plaintiff,          )
                             )
     vs.                      )    Civil Action No. 11-1275
                             )
MICHAEL J. ASTRUE,            )
COMMISSIONER OF SOCIAL        )
SECURITY,                     )
                             )
          Defendant.          )

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff, Gary L. Collins, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his applications for disability
insurance benefits ("DIB") and supplemental security income
("SSI") under Titles II and XVI, respectively, of the Social
Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently
before the Court are the parties' cross-motions for summary
judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth
below, Plaintiff's motion for summary judgment will be denied,

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system.  With respect to Plaintiff's application for DIB, his earnings record
shows that he acquired sufficient quarters of coverage to remain insured
through March 31, 2012.  (R. 12).

1

and the Commissioner's cross-motion for summary judgment will be granted.

**PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on August 7, 2009, alleging disability since August 1, 2009 due to severe aortic valve regurgitation,[2] syncope[3] and hypertension.[4]  (R. 134-39, 165).  Following the denial of Plaintiff's applications on December 22, 2009, he requested a hearing before an administrative law judge ("ALJ").  (R. 65-76, 77-88, 89-90).  Plaintiff, who was represented by counsel, testified at the

---

[2] Aortic valve regurgitation is a condition that occurs when your heart's aortic valve does not close tightly, allowing some of the blood that was just pumped out of your heart's main pumping chamber (left ventricle) to leak back into it.  The leakage of blood may prevent your heart from efficiently pumping blood out to the rest of the body.  As a result, you may feel fatigued and short of breath.  Aortic valve regurgitation, which can develop suddenly or over decades, has a variety of causes ranging from congenital heart defects to complications of infectious illnesses.  Once aortic valve regurgitation becomes severe, surgery is often required to repair or replace the aortic valve.  www.mayoclinic.com.

[3] Syncope, or fainting, is a temporary loss of consciousness.  You lose muscle control at the same time, and may fall down.  Most people recover quickly and completely.  Fainting usually happens when your blood pressure drops suddenly, causing a decrease in blood flow to your brain.  Other causes of fainting include heat or dehydration, emotional distress, standing up too quickly, certain medicines, a drop in blood sugar and heart problems.  www.nlm.nih.gov/medlineplus.

[4] Blood pressure is the force of your blood pushing against the walls of your arteries.  Each time your heart beats, it pumps out blood into arteries.  Your blood pressure is highest when your heart beats, pumping the blood.  This is called the systolic pressure.  When your heart is at rest, between beats, your blood pressure falls.  This is the diastolic pressure.  Blood pressure readings use these two numbers, the systolic and diastolic pressures.  Usually they are written one above or before the other.  A reading of 120/80 or lower is normal blood pressure.  A reading of 140/90 or higher is high blood pressure.  Between 120 and 139 for the top number or between 80 and 89 for the bottom number is prehypertension.  High blood pressure, also referred to as hypertension, usually has no symptoms, but it can cause serious problems such as stroke, heart failure, heart attack and kidney failure.  www.nlm.nih.gov/medlineplus.

hearing which was held on April 7, 2011. A vocational expert ("VE") also testified. (R. 22-61).

The ALJ issued a decision on May 17, 2011, denying Plaintiff's applications for DIB and SSI based on his determination that, despite several severe physical impairments, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[5] (R. 10-21). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on September 7, 2011. (R. 1-6). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

**BACKGROUND**

Plaintiff's testimony during the hearing before the ALJ may be summarized as follows:

Plaintiff was born on July 16, 1957.[6] He is 5'11" tall and weighs 220 pounds. Plaintiff, who is single, resides with his 8-year old daughter. Plaintiff has a driver's license; however, he does not drive due to episodes of syncope 2 to 3 times a week on average. (R. 27-29).

With respect to education, Plaintiff is a high school graduate. In addition, he received training in HVAC (heating, ventilation and air conditioning) installation and service.

---

[5] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a).
[6] At the time of the hearing, Plaintiff was 53 years of age.

Between 1996 and 2009, Plaintiff worked for various companies as an HVAC installer and service technician, an electrician, a plumber and an industrial maintenance worker. (R. 30-34).

Plaintiff suffers from aortic valve regurgitation and will require surgery in the future to replace his aortic valve. Plaintiff also suffers from hypertension for which he takes medication that "knocks [him] off [his] feet." Despite the medication, Plaintiff's hypertension is not controlled. (R. 34, 39). Finally, Plaintiff receives treatment for depression at the Community Counseling Center of Mercer County ("CCCMC").[7] (R. 35-36).

At the time of the hearing, Plaintiff was taking two medications for his heart conditions and one medication for depression.[8] In addition to "extreme fatigue," Plaintiff testified that the medications caused leg cramping and stiffness. (R. 40, 202).

---

[7] At CCCMC, Plaintiff receives counseling from Alexandra Naglia, B.A., a caseworker, and John W. Uber, Ph.D., a psychologist. (R. 35-37, 203).
[8] The heart medications prescribed for Plaintiff at the time of the hearing were Losartan and Nifedipine (brand name Procardia). Losartan is used alone or in combination with other medications to treat high blood pressure. Losartan is also used to decrease the risk of stroke in people who have high blood pressure and a heart condition called left ventricular hypertrophy. It works by blocking the action of certain natural substances that tighten the blood vessels, allowing the blood to flow more smoothly and the heart to pump more efficiently. Nifedipine is used to treat high blood pressure and to control angina (chest pain). It works by relaxing the blood vessels so the heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart. The medication prescribed for Plaintiff's depression was Citalopram (brand name Celexa), which is in a class of antidepressants called selective serotonin reuptake inhibitors. Citalopram is thought to work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance.
www.nlm.nih.gov/medlineplus/druginfo.

4

On a typical day, Plaintiff gets up at 7:00 a.m.; wakes his daughter up, lays out clothes for her to wear and gets her to the bus stop at 8:20 a.m.; sleeps from 8:30 a.m. until 2:30 p.m.; meets his daughter at the bus stop at 3:30 p.m.; prepares dinner for his daughter; sleeps for 2½ hours while his daughter is at counseling;[9] and goes to bed at 10:00 p.m. Plaintiff can perform housework in short intervals. His daughter "is very helpful as far as maintaining the house." Friends assist Plaintiff in doing the laundry and going grocery shopping. (R. 41-44). With respect to hobbies, Plaintiff was an avid hunter and fisherman. However, due to his medical conditions, he can no longer engage in these activities. Plaintiff reads the newspaper and sports magazines. He does not attend church or belong to any social organizations.[10] (R. 44-45).

---

[9] Plaintiff's daughter also receives services from CCCMC. At times, Plaintiff and his daughter attend joint counseling sessions. (R. 36).

[10] Plaintiff completed a Function Report on October 27, 2009 in connection with his applications for DIB and SSI. In contrast to his testimony during the hearing before the ALJ, Plaintiff described a typical day as follows:

> "Wake up daughter and get her ready for school
> Put daughter on bus @ 8:25 AM
> Housework if needed/shop if needed/laundry if needed
> Get daughter off of bus @ 3:50 PM
> Prepare dinner
> Get daughter ready for bed/assist in homework ect. (sic)
> Daughter in bed @ 9:00 PM – Myself at 10:00 PM"

(R. 180).

Plaintiff also indicated in the Function Report that he took care of a pet; he had no problem with personal care; the meals he prepared varied from day to day (i.e., crock pot, oven roasts, fried foods or frozen dinners); he was able to clean and do laundry, although some days he had to push himself to perform these chores; when he went out, he could walk, drive a car and ride in a car; he shopped for food and personal care items twice a month for an

As to physical limitations, Plaintiff can sit for 1 to 1½ hours. Then, he must stand because his left leg "bothers" him. Due to fatigue, Plaintiff can only stand for 15 to 20 minutes, and he "[doesn't] dare" walk more than 100 yards due to fatigue and syncopal episodes. Plaintiff has been instructed by his cardiologist to limit lifting activities to no more than 50 pounds twice a day. (R. 46-48). Regarding mental limitations, Plaintiff has "problems sometimes remembering ... things that concern [his] daughter." Plaintiff also has difficulty focusing on things on occasion. Plaintiff does not have any difficulty getting along with others because he "[doesn't] bother with other people." (R. 48-50).

**VE TESTIMONY**

During the hearing before the ALJ, the VE testified that all of Plaintiff's past relevant work would be classified as skilled work at the heavy exertion level.[11]  (R. 54-55). The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education and work history who is (1) limited to lifting 20 pounds occasionally and 10 pounds frequently; (2) limited to standing and walking for 1 to 2 hours during an 8-hour workday; (3) not limited in his ability to sit during an 8-hour workday;

---

hour or two each time; he could no longer hunt due to his illness, but he read and watched television on a daily basis; and he had problems getting along with family, friends and neighbors.  (R. 181-85).

[11] The Social Security Regulations define "heavy work" as "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. §§ 404.1567(d), 416.967(d).

(4) unable to climb ladders, ropes or scaffolding, crawl or kneel; (5) able to climb ramps and stairs and engage in balancing activities only on occasional; and (6) unable to engage in hazardous activities such as working with dangerous machinery or at unprotected heights. The ALJ then asked the VE whether the hypothetical person could engage in Plaintiff's past relevant work or any other work existing in the national economy. In response, the VE testified that the hypothetical person could not perform any of Plaintiff's past relevant work but could perform the light exertion jobs of a bench assembler (737,000 jobs nationally), a hand packer (200,000 jobs nationally), and a document preparer (300,000 jobs nationally).[12] (R. 55-57).

The ALJ then asked the VE to assume that, in addition to the physical limitations described in his first hypothetical question, the hypothetical person was *markedly* limited (severely limited but not altogether precluded) in his (1) ability to understand and remember short, simple instructions; (2) ability to make judgments on simple work-related decisions; (3) ability to interact appropriately with supervisors, coworkers and the

---

[12] "Light work" is defined in the Social Security Regulations as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

public; and (4) ability to respond appropriately to changes in a routine work setting. The ALJ then asked the VE whether there were any jobs the second hypothetical person could perform, and the VE responded: "no." (R. 57-58).

**MEDICAL EVIDENCE**

On August 3, 2009, Plaintiff was evaluated by his primary care physician ("PCP"), Dr. Scott Morgan, for "episodes of sudden, severe dizziness where he goes down." Plaintiff denied complete loss of consciousness, indicating that he can get back up and function shortly after the episodes. Plaintiff also complained of fatigue. Plaintiff was admitted to Sharon Regional Health System for cardiology and neurology consultations. (R. 217, 233-34).

On August 4, 2009, an echocardiogram was performed which showed that Plaintiff's left ventricular cavity was at the upper limits of normal; his systolic dimension was normal with moderately severe hypertrophy;[13] his ejection fraction (65%) was normal;[14] he had moderately severe to severe 3+ to 4+ aortic

---

[13] Left ventricular hypertrophy ("LVH") is enlargement (hypertrophy) of the muscle tissue that makes up the wall of your heart's main pumping chamber (left ventricle). LVH develops in response to some factor, such as high blood pressure that requires the left ventricle to work harder. As the workload increases, the walls of the chamber grow thicker, lose elasticity and eventually may fail to pump with as much force as a healthy heart. LVH is more common in people who have high blood pressure or other heart problems. www.mayoclinic.com.

[14] Ejection fraction is a measurement of the percentage of blood leaving your heart each time it pumps. Because the left ventricle ("LV") is the heart's main pumping chamber, ejection fraction is usually measured only in the LV. A normal LV ejection fraction is 55 to 70%. www.mayoclinic.com.

insufficiency; and he had mild mitral and tricuspid regurgitation.  (R. 209-10).

The same day, Plaintiff was evaluated in the hospital by Dr. Dilip Patel, a pulmonologist.  After examining Plaintiff and reviewing his test results, Dr. Patel's clinical diagnoses included dizziness with recurrent syncopal episodes, severe aortic regurgitation, and uncontrolled hypertension.  Dr. Patel recommended a transesophageal echocardiogram and cardiac catheterization to evaluate Plaintiff's left ventricular function, aortic regurgitation and any coronary artery disease. In the event these tests revealed severe aortic regurgitation, Dr. Patel indicated that a cardiothoracic surgical consultation probably would be ordered for Plaintiff.  (R. 217-19).

On August 5, 2009, Plaintiff underwent a transesophageal echocardiogram and a right and left heart catheterization.  The transesophageal echocardiogram revealed normal systolic left ventricular function, mild left atrial dilatation,[15] mild 1+ mitral regurgitation with mild sclerosis of the valve,[16] mild 1+

---

[15] Dilatation is the condition of being stretched beyond normal dimensions especially as a result of overwork or disease or of abnormal relaxation. www.merriam-webster.com/medical.

[16] Aortic valve calcification is a condition in which calcium deposits form on the aortic valve in the heart.  These deposits can cause narrowing at the opening of the aortic valve.  This narrowing can progress to become severe enough to reduce blood flow through the aortic valve, a condition called aortic valve stenosis.  Calcification and stenosis typically affect people older than age 65.  When it occurs in younger people, it is often caused by a heart defect that is present at birth, other illnesses such as kidney failure or high cholesterol.  It is important to have your cholesterol checked because you may need medications to lower cholesterol and help prevent aortic

9

tricuspid regurgitation, mild 1+ pulmonic regurgitation and
moderately severe 3+ aortic regurgitation. (R. 211-12). The
right heart catheterization showed mild pulmonary hypertension,[17]
and the left heart catheterization showed abnormal valve
function with moderate aortic insufficiency. Medical management
was recommended. (R. 207-08).

Prior to his discharge from Sharon Regional Health System
on August 6, 2009, Plaintiff underwent a consultation with Dr.
Gary Marrone, a cardiothoracic surgeon, for his near syncopal
episodes, severe aortic regurgitation and possible need for
aortic valve replacement surgery. Plaintiff informed Dr.
Marrone that he had developed episodes of near syncope over the
previous 6 months. He denied palpitations, antecedent symptoms
and exertional chest pain or shortness of breath, stating that
he could walk at least a half a mile without experiencing
shortness of breath. Based on his physical examination of
Plaintiff and Plaintiff's test results, Dr. Marrone described
his impression as (1) near syncopal episodes of uncertain
etiology, (2) accelerated hypertension, and (3) severe aortic

---

valve sclerosis from getting worse. If the valve becomes severely narrowed,
aortic valve replacement surgery may be necessary. www.mayoclinic.com.
[17] The right side of the heart pumps blood through the lungs where it picks up
oxygen. Then, the blood returns to the left side of the heart where it is
pumped to the whole body. When the small arteries (blood vessels) of the
lung become narrowed, they cannot carry as much blood. When this happens,
pressure builds up. This is called pulmonary hypertension. The heart needs
to work harder to force the blood through the vessels against this pressure.
Over time, this causes the right side of the heart to become larger. Not
enough blood flows to the lungs to pick up oxygen.
www.nlm.nih.gov/medlineplus/encyc.

regurgitation with preserved left ventricular function.  To
exclude an arrhythmia (irregular heartbeat), an event monitor
was ordered for Plaintiff to use upon his discharge from the
hospital.  Because Plaintiff's left ventricle was not dilated,
his left ventricular function was preserved and he reported
"fairly good exercise tolerance," Dr. Marrone concluded that
surgery to replace Plaintiff's aortic valve was not warranted at
that time.  Rather, Plaintiff would be followed with serial
echocardiograms.  (R. 222-23).

Plaintiff's final diagnoses upon discharge from Sharon
Regional Health System on August 6, 2009 included (1) severe
aortic regurgitation "not yet surgical;" (2) syncope and
collapse; (3) hypertension; (4) chronic obstructive pulmonary
disease ("COPD");[18] and (5) coronary artery disease.  His
discharge medications included a 325 mg. aspirin daily,
Lisinopril[19] and Nifedipine (brand name Procardia).  (R. 229).

On September 12, 2009, Plaintiff was admitted to Sharon
Regional Health System from the emergency room for continued
complaints of blacking out.  Plaintiff reported that the
episodes lasted for 30 to 60 seconds during which he could not

---

[18] With respect to the COPD diagnosis, at the time of his admission to the
hospital on August 3, 2009, Plaintiff reported that he had been a smoker
until September of 2008.  (R. 253).  During a consultation with Dr. Robert
Salcedo the next day, Plaintiff reported that he was "a long-term chronic
smoker, trying to quit."  (R. 270).
[19] Lisinopril is used alone or in combination with other medications to treat
high blood pressure.  www.nlm.nih.gov/medlineplus/druginfo.

11

see or move. Plaintiff denied chest pain or palpitations, but complained of shortness of breath with exertion. Dr. James Ryan, who evaluated Plaintiff during this hospital admission, noted that recent event monitoring for near syncope did not reveal any significant arrhythmia during episodes, and that Plaintiff suffered from valvular heart disease (3+ aortic regurgitation) and hypertension. Dr. Ryan indicated that Plaintiff's heart rhythm would continue to be monitored and a further consultation with neurology would be ordered to ensure that Plaintiff did not have a seizure disorder. (R. 220-21).

While hospitalized, Plaintiff was re-evaluated by Dr. Marrone for aortic valve replacement surgery. Plaintiff reported that over the previous 8 days, he had experienced sudden onset weakness, blurry vision, lightheadedness and myalgias at both rest and with exertion; the symptoms resolved spontaneously within a minute; and he had no definite loss of consciousness, chest pain, shortness of breath or palpitations during the episodes. Dr. Marrone concluded that arrhythmia and neurologic causes must be excluded, and Plaintiff was agreeable to cardiology and neurology evaluations. However, in the event no reason for the near syncopal episodes was discovered,

Plaintiff expressed his desire to be considered for aortic valve replacement surgery.[20]   (R. 337-38).

Plaintiff signed himself out of the hospital on September 15, 2009 against medical advice. (R. 315). However, he returned shortly thereafter with continued complaints of lightheadedness, syncope and dizziness. He also reported ringing in his ears, nausea and weakness, indicating that the episodes may have been brought on by stress. Dr. Marrone described Plaintiff as a "little bit anxious" during his physical examination but in no acute distress. He re-admitted Plaintiff, indicating that a psychiatric consultation, as well as a prescription for Citalopram (brand name Celexa), would be considered for possible panic attacks.[21]   (R. 227-28).

During a mental status examination the day of his re-admission to the hospital, Plaintiff reported that he had lost his employment at a steel mill; he was homeless; and he was feeling helpless, hopeless and overwhelmed by stressors with "frequent thoughts of ending his life, ... to have everything over with." Plaintiff's appearance and grooming were described

---

[20] Although the doctor believed Plaintiff's aortic valve could be followed safely with serial echocardiograms and physical exams, Plaintiff expressed interest in aortic valve replacement to "eliminate worry about his heart function deteriorating." (R. 338).

[21] Plaintiff reported that he had signed himself out of the hospital against medical advice to rush to his daughter whom he believed was in danger and his ex-wife would not answer the telephone. Plaintiff contacted the police. However, it had turned out to be nothing of consequence. Nevertheless, he became very agitated when his ex-wife refused to communicate with him and had a syncopal episode in her driveway. At that time, paramedics were called. Plaintiff was transported back to the hospital and re-admitted. (R. 227).

13

as "clean, cared for;" his eye contact as "good;" his speech as "normal;" his affect and mood as "anxious;" his memory as "good;" and his judgment and insight as "fair." Plaintiff was diagnosed with an anxiety disorder.

On September 19, 2009, Plaintiff was transferred to the psychiatric unit of Sharon Regional Health System for treatment in an attempt to determine whether his near syncopal episodes were anxiety-related. (R. 429-31). The notes of Dr. Wally Novero, a psychiatrist who examined Plaintiff on September 20, 2009, state Plaintiff "strongly admits that he has no anxiety and does not want to consider anxiety [to be the cause of his near syncopal episodes] yet until he is fully worked up medically." Dr. Novero's assessment of Plaintiff was mood disorder, and rule out anxiety disorder, conversion disorder and depression. Plaintiff was encouraged to attend group therapy while in the hospital. However, he declined psychiatric services on an outpatient basis following his discharge from the hospital. (R. 417-19). The same day, Plaintiff executed a Request to Withdraw from Treatment within 72 hours. (R. 413). He was described as "doing well" at the time of discharge from the hospital on September 22, 2009, and he was given contacts for supportive housing.[22] (R. 414, 455).

_____

[22] On March 23, 2011, Alexandra Nagel, B.A., a caseworker at CCCMC, sent a letter to Plaintiff's counsel indicating Plaintiff had been in CCCMC's supportive housing program since September 22, 2009 (the day of his discharge

14

During a follow-up visit on September 28, 2009 with his PCP, Dr. Morgan, Plaintiff's aortic valve regurgitation was described as stable, and the dosage of his hypertension medication was increased. As to anxiety, Plaintiff was described as doing well on Citalopram (brand name Celexa). Dr. Morgan noted that since Plaintiff had started this medication, he had not experienced a panic attack or a near syncopal episode, despite increased stressors at home. (R. 497).

On November 25, 2009, Plaintiff was evaluated by Dr. Nicola Nicoloff, a cardiologist with Sharon Cardiology Specialists, to follow-up on his recent hospitalization for near syncope. Plaintiff reported that he experienced near syncopal episodes when rising from a squatting position; he occasionally had atypical chest discomfort and shortness of breath with exertion; and he lacked energy. Dr. Nicoloff's plan for Plaintiff included possible referral for additional tests; a repeat echocardiogram in February 2010; the rescheduling of a follow-up appointment with Dr. Marrone, the cardiothoracic surgeon who had evaluated Plaintiff for possible aortic valve replacement during his hospitalizations at Sharon Regional Health System in August

---

from Sharon Regional Health System); that this program provides services to individuals with mental health problems who are living independently in the community; that she had provided assistance to Plaintiff in finding affordable housing for him and his daughter; and that she also provided assistance to Plaintiff with regard to Social Security Office and medical appointments and domestic relations hearings. (R. 203). In fact, Ms. Nagel drove Plaintiff to his hearing before the ALJ. (R. 35).

and September 2009, because Plaintiff had not attended his scheduled one-month follow-up appointment with Dr. Marrone; and a follow-up visit with Sharon Cardiology Specialists in March 2010 after Plaintiff's echocardiogram.  (R. 214-15).

On December 9, 2009, Plaintiff underwent a consultative disability examination by Dr. Mary Dougherty.  Plaintiff reported that he continued to experience "some" near syncopal episodes which usually happened if he walked more than 100 feet, exerted himself or climbed an incline.  Plaintiff also reported that he had custody of his then 7-year old daughter; he lived in a one-story home; he was able to perform activities of daily living; he did all of the grocery shopping; and he was afraid to drive due to the near syncopal episodes.[23]  Plaintiff's physical examination revealed, among other things, no edema in his extremities; no evidence of atrophy in any major muscle group; motor strength of 5+ throughout; reflexes of 2+ bilaterally; and the ability to squat and bend with no dizziness.  (R. 512-16).

In a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities completed the day of the consultative examination, Dr. Dougherty opined that Plaintiff could occasionally lift and carry 25 pounds; stand and walk 1 to 2 hours in an 8-hour workday; sit without limitation

---

[23] With regard to employment, Plaintiff told Dr. Dougherty that he last worked the previous year for 3 months.  Plaintiff indicated that due to problems with his ex-wife, he had been "let go."  (R. 514).

during an 8-hour workday; push and pull with his upper and lower extremities without limitation; should never engage in balancing and climbing activities; and had no environmental limitations. (R. 501-02).

In a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities completed on December 15, 2009, Dr. Ronnie Mignella, a cardiologist with Sharon Cardiology Specialists, opined that Plaintiff could occasionally lift and carry 25 pounds; could stand, walk and sit "as tolerated;" could not excessively push and pull with his upper and lower extremities; could engage in postural activities and other physical functions (bending, kneeling, stooping, crouching, balancing, climbing, reaching, handling, feeling) "as tolerated;" and must avoid poorly ventilated environments, temperature extremes, fumes, odors, gases and humidity. (R. 204-05).

On December 21, 2009, Dr. Paul Fox, a State agency medical consultant, completed a physical RFC assessment of Plaintiff based on a review of the administrative file. Dr. Fox opined that Plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; he could stand and/or walk about 6 hours in an 8-hour workday; he could sit about 6 hours in an 8-hour workday; his ability to push and pull with his upper and lower extremities was unlimited; he could occasionally

climb and balance but never kneel or crawl; he had no
manipulative, visual or communicative limitations; and he should
avoid exposure to hazards such as dangerous machinery and
heights.  (R. 517-23).

Edward Zuckerman, Ph.D., a State agency psychological
consultant, completed a Psychiatric Review Technique form based
on a review of Plaintiff's file on December 22, 2009.  Dr.
Zuckerman based his opinion of the severity of Plaintiff's
mental impairments on anxiety-related disorders.  Dr. Zuckerman
opined that Plaintiff had no restriction in his activities of
daily living and no difficulty maintaining social functioning.
Dr. Zuckerman further opined that Plaintiff's difficulties in
concentration, persistence or pace were mild, and there was
insufficient evidence of repeated episodes of decompensation,
each of extended duration.  In sum, Dr. Zuckerman opined that
Plaintiff's mental impairments were not severe.  (R. 524-36).

During a follow-up visit with Dr. Jose Millan, a
cardiologist with Sharon Cardiology Specialists, on May 20,
2010, Plaintiff admitted to periodic chest pain throughout the
day, as well as brief, infrequent heart palpitations and
dizziness with rapid positional changes (i.e., rising from a
squatting position).  Plaintiff denied shortness of breath, and
he had no ankle edema.  Plaintiff reported that he smoked 8
cigarettes a day; did not try to follow a low-fat diet; but

exercised, estimating that he walked 2 miles per week. Plaintiff reported compliance with his medication regime, but stated that he was tired "all of the time" and had "more bad days than good." As a result, Plaintiff wanted to discuss aortic valve replacement surgery. With respect to his assessment/plan, Dr. Millan indicated that, prior to a further cardiothoracic surgery consult, an echocardiogram would be ordered for Plaintiff. Plaintiff was instructed to take the Nifedipine (brand name Procardia) in the morning and the Lisinopril in the evening which may alleviate his feelings of fatigue. Dr. Millan noted that Plaintiff's hypertension was controlled, and his coronary artery disease was mild in nature and asymptomatic. Plaintiff was strongly encouraged to stop smoking. He declined any formal smoking cessation counseling at that time. Plaintiff was advised to follow-up with Dr. Millan in 6 months after having an echocardiogram. (R. 546-48).

The echocardiogram ordered by Dr. Millan was performed on September 17, 2010. The test showed that Plaintiff's left ventricle was normal in size and systolic function; he had moderately severe left ventricular hypertrophy with evidence of diastolic relaxation abnormality; his right ventricle was hypertrophied with normal systolic function; he had mild 1+ mitral valve regurgitation, moderately severe 3+ aortic valve insufficiency, and mild 1+ tricuspid valve insufficiency; his

pulmonary artery pressure was normal; and he had mild 1+
pulmonic valve insufficiency. When compared with his
echocardiogram on August 5, 2009, Plaintiff's systolic function
had not changed significantly, and the degree of aortic
insufficiency had remained consistent at moderately severe 3+.
(R. 551-52).

Plaintiff was seen by Dr. Marrone for another
cardiothoracic surgical consultation on November 10, 2010.
Based on an examination of Plaintiff and the results of his
recent echocardiogram, Dr. Marrone concluded that surgery could
be delayed because Plaintiff did not have any significant left
ventricle dysfunction or dilatation. In his letter to Dr.
Millan following the consultation, Dr. Marrone suggested
additional tests to determine the etiology of Plaintiff's near
syncope, expressing his opinion that surgery to replace his
aortic valve may not resolve the near syncopal episodes.

Plaintiff's next follow-up visit with Dr. Millan occurred
on January 13, 2011. Plaintiff complained of persistent
fatigue, occasional lightheadedness and increasing exertional
dyspnea. He denied chest pain, palpitations, ankle edema or
claudication (pain in the calf, thigh or hip muscle) with daily
activities which he performed "as tolerated." Following his
physical examination of Plaintiff, Dr. Millan noted that
Plaintiff's coronary artery disease remained mild with no overt

symptomatology; he adjusted Plaintiff's medications for
hypertension; he encouraged Plaintiff to continue to work on
reducing his high cholesterol levels; he ordered a complete
blood count to determine whether Plaintiff's fatigue was the
result of anemia; he urged Plaintiff to pursue a neurology
evaluation for a recent episode of double vision; and he
instructed Plaintiff to return in one month for a follow-up
visit.  (R. 605-07).

     During the follow-up visit with Dr. Millan on February 28,
2011, Plaintiff denied chest pain, palpitations, ankle edema and
lightheadedness, and indicated that there had been no change in
his exertional dyspnea.  Plaintiff reported that he was
compliant with his medication regime, but he had not been
following any dietary restrictions.  Plaintiff reported that he
remained active with regard to activities of daily living;
however, he was not on an exercise regime.  Dr. Millan
instructed Plaintiff to follow-up with him in 4 months.  (R.
610-12).

     On April 21, 2011, two weeks after Plaintiff's disability
hearing, John W. Uber, Ph.D., sent the following letter to
Plaintiff's attorney who, in turn, submitted the letter to the
ALJ for consideration prior to rendering his decision on
Plaintiff's applications for DIB and SSI:

> Mr. Collins met with me on March 10, 2011 and March 24,
> 2011. At the initial session he discussed concerns
> regarding his physical health and how he was not able to do
> the work that he had been doing his whole life. He
> discussed his concerns for his daughter and his ability to
> care for her due to his poor physical health. He reported
> that his medical concern was such that he could not return
> to the work that he was trained to do. At the second
> session he reported that things had made slight improvement
> in his medical condition but not to the point that he would
> be able to return to a productive life style. He continued
> to have depressive symptoms with occasional thoughts of
> giving up and not wanting to be alive. He still reported
> being "worn out" from the court battles in regard to his
> daughter's custody concerns.

(R. 616).

Dr. Uber also provided Plaintiff's counsel with a Medical Source

Statement of Ability to Do Work-Related Activities (Mental), in

which he opined that Plaintiff was *slightly* limited in his

ability to carry out short, simple instructions and *markedly*

limited in the following abilities: (1) understand and remember

short, simple instructions; (2) understand, remember and carry

out detailed instructions; (3) make judgments on simple, work-

related decisions; (4) interact appropriately with the public,

supervisors and co-workers; (5) respond appropriately to normal

work pressures; and (6) respond appropriately to changes in a

routine work setting. (R. 582-84).

**ALJ'S DECISION**

In order to establish a disability under the Social

Security Act, a claimant must demonstrate an inability to engage

in any substantial gainful activity due to a medically

22

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The process was described by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

* * *

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for

benefits without further inquiry. § 416.920(d). If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps. At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience. If the
claimant cannot do his past work or other work, he
qualifies for benefits.

\*    \*    \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one

through four of the sequential evaluation process for making

disability determinations. At step five, the burden shifts to

the Commissioner to consider "vocational factors" (the

claimant's age, education and past work experience) and

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy in

light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546,

550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in Plaintiff's favor: that is, the ALJ found

that Plaintiff had not engaged in substantial gainful activity

since August 1, 2009, the alleged onset date of disability, and

the medical evidence established that Plaintiff suffers from the

severe physical impairments of hypertension and aortic valve regurgitation.[24]   (R. 12).

Turning to step three, the ALJ found that Plaintiff's physical impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 4.00, relating to the cardiovascular system.  (R. 14).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform less than a full range of light work due to the following limitations: (1) the ability to balance and climb ramps and stairs only on occasion; (2) the inability to crawl, kneel or climb ropes, ladders or scaffolding; and (3) the inability to perform work involving unprotected heights and hazardous machinery.  (R. 15).  The ALJ then proceeded to step four, finding that Plaintiff is unable to perform any of his past relevant work.  (R. 19).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in the national economy, including the jobs of a bench assembler, a hand packer and a document preparer.  (R. 20).

_____

[24] After discussing the evidence in the record relating to depression and anxiety, the ALJ found that Plaintiff's mental impairments were not severe. (R. 13-14).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

**I**

Plaintiff's initial argument in support of his motion for summary judgment pertains to the ALJ's finding on the credibility of Plaintiff's statements regarding the work-related limitations resulting from his impairments. Specifically, Plaintiff contends that "the ALJ's two-sentence [credibility] evaluation did not comport with the requirements of Social Security Ruling ("SSR") 96-7p,[25] nor (sic) the Commissioner's

---

[25] Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of

regulations." (Docket No. 15, p. 11). After consideration, the Court finds Plaintiff's argument regarding the ALJ's credibility determination unpersuasive.

A symptom is an individual's own description of his or physical or mental impairments. The purpose of SSR 96-7p is threefold: (1) to clarify cases in which evaluation of a claimant's symptoms requires a determination of the credibility of the claimant's statements about his or her symptoms and their functional effects; (2) to explain the factors the ALJ should consider in assessing the credibility of a claimant's statements about symptoms; and (3) to state the importance of an ALJ's explanation of the reasons for his or her credibility determination in the disability decision. SSR 96-7p provides in part:

\*   \*   \*

... when evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors

the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

that are described in the regulations for evaluating
symptoms.  The determination or decision must contain
specific reasons for the finding on credibility, supported
by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and
to any subsequent reviewers the weight the adjudicator gave
to the individual's statements and the reasons for that
weight.  This documentation is necessary in order to give
the individual a full and fair review of his or her claim,
and in order to ensure a well-reasoned determination or
decision.

                    *    *    *

     Contrary to Plaintiff's assertion, the ALJ's evaluation of

his credibility in the adverse decision was not limited to two

sentences.  In fact, the issue was discussed at length by the

ALJ (R. 16-19), and the Court agrees with the Commissioner that

substantial evidence supports the ALJ's determination that

Plaintiff's statements regarding the extent to which he is

limited by his impairments were not entirely credible.  (Docket

No. 20, p. 11).

     With regard to Plaintiff's testimony during the hearing

that he has memory issues, difficulty focusing and does not

socialize, the ALJ noted the scant evidence of mental health

treatment in the record.  In particular, the ALJ noted that

during the September 28, 2009 visit with his PCP to follow-up on

the recent admission to the psychiatric unit of Sharon Regional

Health System, Plaintiff reported that he was doing well on the

medication which had been prescribed for anxiety.  In fact,

Plaintiff reported "no further panic attacks or near syncopal

episodes since starting [Celexa] despite increased stressors at home." As to Plaintiff's testimony regarding treatment by Dr. Uber, the ALJ noted the failure of Plaintiff's counsel to submit any treatment records, despite being given 30 days following the hearing to do so. The only evidence concerning Plaintiff's mental health that was provided following the disability hearing consisted of Dr. Uber's letter to counsel dated April 21, 2011, which states that Dr. Uber had seen Plaintiff on two occasions the preceding month, and the accompanying medical source statement which was not supported by any of the psychologist's treatment notes. (R. 17). In sum, with the exception of a prescription for an anti-depressant medication, there is no evidence that Plaintiff received mental health treatment between October 2009 and March 2011, a gap of 17 months.

The ALJ also adequately explained his reasons for not entirely crediting Plaintiff's testimony during the hearing regarding the severity of the limitations resulting from his physical impairments. Specifically, the ALJ noted the following evidence:

1. The November 25, 2009 office note of Dr. Nicoloff, a treating cardiologist, states that Plaintiff's exercise included daily activities and walking; although Plaintiff had moderately severe aortic valve regurgitation, his left ventricle remained normal in size; Plaintiff's hypertension was controlled; and Plaintiff's mild coronary artery disease was stable (R. 18);

2. The report of Plaintiff's consultative examination by
Dr. Dougherty on December 9, 2009 states that Plaintiff
reported the ability to do all activities of daily living,
including all of the grocery shopping, and indicates that
Plaintiff's physical examination revealed well-controlled
blood pressure, no atrophy in any major muscle group,
normal motor strength in all of his extremities and the
ability to squat and bend without experiencing dizziness
(R. 18);

3. During an office visit with his cardiologist on May
20, 2010, Plaintiff reported walking approximately 2 miles
a week; the only change in his medication management was an
instruction on the time of day to take his medications in
an attempt to alleviate his complaints of fatigue; his
blood pressure was controlled; and his coronary artery
disease was mild in nature and completely asymptomatic (R.
18);

4. The echocardiogram performed on September 17, 2010,
showed that Plaintiff's aortic valve regurgitation remained
unchanged since his August 5, 2009 echocardiogram and his
pulmonary artery pressure was normal (R. 18-19);

5. Plaintiff's work history prior to his alleged onset
date was sporadic (R. 19); and

6. There is no evidence from any treating source with
whom Plaintiff has a long treatment history indicating that
Plaintiff's physical impairments preclude him from engaging
in some type of gainful activity (R. 19).

Simply put, there is no basis for a finding that the ALJ failed

to comply with SSR 96-7p in making the credibility determination

in this case.

## II

Next, Plaintiff asserts the ALJ erred in the analysis of

the evidence relating to his mental impairments. Specifically,

Plaintiff maintains the ALJ failed to address his psychiatric

hospitalization in September, 2009, as well as Dr. Uber's

opinion regarding the severity of his mental limitations that were set forth in the medical source statement provided to his counsel on April 21, 2011. In conclusion, Plaintiff argues: "To state that there is no medical objective evidence that substantiates a showing of mental health impairment is simply error by the ALJ." (Docket No. 15, p. 13). Again, the Court finds Plaintiff's argument unpersuasive.

The ALJ's decision does, in fact, discuss both Plaintiff's psychiatric hospitalization in September 2009 ("... the claimant's hospital records suggest that stress or panic may have been involved in his near syncopal episode, ... the claimant was prescribed Celexa by his primary care physician at Sharon Regional Health System,"), and the opinion rendered by Dr. Uber in the medical source statement completed in conjunction with the psychologist's April 21, 2011 letter to Plaintiff's counsel ("nothing in the record suggests that the claimant ... even approaches the 'marked' and 'extreme' level of psychological limitation apparently opined in an undated opinion prepared by Dr. Uber which fails to reference the claimant or any other individual"). (R. 14).

As the foregoing paragraph indicates, the ALJ clearly did not find a lack of evidence concerning a mental impairment in this case. Rather, the ALJ concluded that Plaintiff's mental impairment was not severe; that is, Plaintiff's mental

impairment did not cause more than minimal limitations in his work-related functioning. This finding is clearly supported by substantial evidence, including the Psychiatric Review Technique form completed by Dr. Zuckerman, a State agency psychological consultant,[26] and the substantial gap in Plaintiff's treatment for mental health issues.

### III

Finally, as noted in the Court's summary of the VE's testimony during Plaintiff's disability hearing, the ALJ posed two hypothetical questions to the VE. The first hypothetical question included the limitations resulting from Plaintiff's physical impairments, and the VE testified that the first hypothetical person retained the ability to perform substantial gainful activity. The second hypothetical question incorporated the medical source statement of Dr. Uber (opining that Plaintiff was markedly limited in a significant number of work-related mental activities) into the first hypothetical question, and the VE testified that the second hypothetical person could not engage in substantial gainful activity. Plaintiff maintains the

---

[26] State agency medical and psychological consultants are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. ALJs must consider findings and other opinions of State agency medical and psychological consultants as opinion evidence. See 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2). In concluding that Plaintiff's mental impairment was not severe, the ALJ gave significant weight to Dr. Zuckerman's opinion. (R. 14).

ALJ erred in not basing his decision on the VE's response to the second hypothetical question. The Court does not agree.

As discussed above, substantial evidence supported the ALJ's rejection of the opinions rendered in Dr. Uber's medical source statement. As a result, the ALJ was free to disregard the VE's response to the second hypothetical question and base his decision on the VE's testimony in response to the first hypothetical question.

William L. Standish
United States District Judge

Date: July 17, 2012